## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 17 2016, 6:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Trenna S. Parker
Noblesville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of J.F. (Minor Child,

And

L.F. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

March 17, 2016

Court of Appeals Case No. 29A02-1508-JC-1306

Appeal from the Hamilton Circuit Court

The Honorable Paul A. Felix, Judge

Trial Court Cause No. 29C01-1502-JC-196

**Riley, Judge.**

## STATEMENT OF THE CASE

[1]  Appellant-Respondent, L.F. (Mother), appeals the trial court's order finding probable cause to exist that J.F. (Child) was a child in need of services (CHINS). [1]

[2]  We affirm.

## ISSUE

[3]  Mother raises one issue on appeal, which we restate as follows: Whether the trial court's decision to adjudicate Child as a CHINS was supported by clear and convincing evidence.

## FACTS AND PROCEDURAL HISTORY

[4]  Child was born to Mother and M.K. (Father) (collectively, Parents) on March 16, 2005. Parents were never married, but continued to live together. Their family life was full of domestic violence and alcohol abuse incidents. Between 2005 and 2015, law enforcement received 149 calls from Parents' residence. Out of those, "146 [calls] were concerning domestic violence or domestic altercations." (Transcript. p. 7). Both Parents had multiple arrests. Mother was arrested in September 2003 for public intoxication; in December 2003 for resisting law enforcement, disorderly conduct, and public intoxication; in April 2006 for neglect of a dependent, maintaining a common nuisance, and

---

[1] Child's father did not contest the trial court's adjudication of Child as a CHINS. He does not join this appeal.

possession of paraphernalia; and in June 2011 for operating a vehicle while intoxicated. Likewise, Father was arrested in April 2006 for neglect of a dependent, maintaining a common nuisance, and possession of paraphernalia; and for domestic batteries in March 2010, January 2011, and January 2015. Father's domestic battery cases all involved battery against Mother.

[5] On October 11, 2013, Parents' neighbor called the police reporting that Child was at her residence and afraid to go home due to Parents' alcohol abuse and physical confrontation. A police officer arrived to investigate the report and talked to Mother. He smelled alcohol on her breath and observed her eyes to be red and glassy; Mother registered a 0.14 BAC. After discussing the circumstances with a representative of the Department of Child Services (DCS), Parents agreed to let Child spend the night at the neighbor's house until both Parents became sober. Parents also agreed to look into counseling services for Child and signed a safety plan to provide a safe environment for Child.

[6] On February 10, 2014, Child called the police stating that she was afraid that her Mother "would beat her" because Parents were arguing and using profanity in her presence. (Appellant's App. p. 75). This was the twenty-seventh call to the police from the family's residence within the last twelve months. An officer was dispatched to assess the situation. He observed Mother to be disoriented and intoxicated. Mother informed the officer that she was suffering from bipolar disorder and schizophrenia. The officer contacted DCS, and once the DCS representative arrived, they walked into the house to interview Parents. Inside, the officer smelled the "odor of marijuana" and observed numerous

alcohol containers that were within Child's reach, as well as food, clothes, and garbage scattered around the residence. (Appellant's App. p. 75).

[7]    On January 7, 2015, at approximately 10 a.m., while Child was at school, Parents had a fight over a beer. Father punched Mother in the face and knocked her tooth out causing her to bleed from her mouth. Both Parents were drunk; Father registered a 0.165 BAC. Father was arrested and charged with domestic battery. Later, on March 5, 2015, Father pled guilty to domestic battery, a Level 6 felony, and was sentenced to 545 days at the Department of Correction with 385 days suspended to probation.

[8]    Two days later, on January 9, 2015, DCS received a report alleging that Child was a victim of neglect. The report included allegations of Parents' domestic violence and alcohol abuse and Mother's mental health which affected her ability to provide for Child's needs and supervision. DCS Family Case Manager Marshall Despain (FCM Despain) attempted to contact Mother on several occasions, but she refused to cooperate and demanded that FCM Despain disclose the source of the report. On January 28, 2015, DCS received an additional report with the same allegations. FCM Despain again attempted to contact Mother several times, including two instances when FCM Despain arrived at Mother's residence accompanied by police, but she remained hostile towards DCS. On February 13, 2015, FCM Despain contacted Father at the Hamilton County Jail. Father expressed his concerns regarding Mother's mental health and how that could affect Child. Father stated that he was the primary caregiver for Child and Mother. He stated that Mother sleeps

extensively during the day because she experiences manic episodes during the night which causes her to become tired by the time Child needs to go to school or when Child returns from school.

[9] Sometime in February 2015, Mother called the police and reported that there were "dust bunnies" jumping around inside her residence. (Tr. p. 112). She claimed the dust bunnies were living creatures. The police officers arrived and investigated the complaint but did not discover anything. Mother informed one of the officers that she stopped using her medication shortly prior to the incident. The officer observed Child sleeping in her bed at the time. In another similar instance, Mother called her sister, Geralyn Neu (Aunt Neu), asking for help. When Aunt Neu arrived at Mother's residence, Mother was naked and "just rumbl[ed] through her belongings with really no sense of anything." (Tr. p. 156). Mother informed Aunt Neu that she was not taking her medication and complained that her house was full of snakes, possums, and raccoons.

[10] On February 16, 2015, DCS recommended filing of a CHINS petition providing the following reasoning:

> The consistent and escalating domestic violence/disputes between [Father] and [Mother] as documented by local law enforcement reports. Per review of law enforcement records for the past 10 years, 146 documented calls to the home of [Parents were] concerning domestic disputes and domestic violence. Per law enforcement reports, some of the incidents resulted in bodily injury to either or both [Father] and [Mother]. Per law enforcement reports, [Child] was present in the home during some of these altercations and [Father] was arrested for domestic battery 3 times. There are 4 prior DCS assessments concerning

similar allegations, which were all unsubstantiated. However, the documentation of each DCS report alleges escalating behaviors of domestic disputes and physical altercations between [Father] and [Mother] per each report. In addition to the law enforcement reports of domestic violence/disputes, there are reported concerns of [Parents] being impaired by their alcohol use. Both [Parents] were arrested in 2006 for Neglect of a Dependant (sic) concerning [Child]. FCM Despain has been unable to address the allegations with [Mother], as she refuses to communicate or consult regarding the child abuse/neglect allegations. In addition reported concerns of [Mother's] mental health in regards to caring for [Child]; as documented by local law enforcement reports and [Father's] interview. The consistent pattern of behaviors regarding escalating domestic violence and substance abuse by [Parents] as documented by local law enforcement reports is detrimental to the safety and well-being of [Child] without interventions and services by DCS.

(Appellant's App. p. 29).

On February 23, 2015, the trial court held a probable cause hearing to determine if probable cause existed to believe that Child was a CHINS, and to determine whether DCS should proceed with a CHINS petition. Mother initially appeared for the hearing but was asked to wait outside of the courtroom for another hearing to end. While waiting outside, FCM Despain explained to Mother the nature of the hearing and discussed DCS's concerns in the matter. Then, Mother left and did not return. The trial court proceeded with the hearing in Mother's absence. Father was present but he was in custody due to his arrest on January 7, 2015. At the conclusion of the hearing, the trial court advised the parties that there was probable cause and authorized DCS to

file a CHINS petition, which was subsequently filed on March 3, 2015. On March 5, 2015, the trial court held an initial hearing on the CHINS petition.

[12] On April 14, 2015, DCS received a new call regarding Child. Child did not report to her school that morning but appeared later in the day. The school's resource officer contacted DCS. A case manager interviewed Child in school and determined that she was not safe in Mother's care. DCS removed Child from her home and placed her with Aunt Neu. The case manager attempted to talk to Mother, "[b]ut she was so mad and not really making sense." (Tr. p. 150). Mother was mocking the case manager, making demeaning expressions and tones of voice, and refusing to talk. The trial court held a detention hearing the next day, April 15, 2015, and made the following additional findings pertaining to Child's removal:

> [On April 14, 2015], [Mother] was found in a state of intoxication and/or manifesting mental health disorders that make the continued residence of [Child] in [Mother's] home contrary to the safety of [Child] and [Child's] best interests. This includes being observed with slurred speech, incoherent speech, the smell of alcohol on [Mother's] person, and the inability to recollect a conversation with a resource officer within hours of having that conversation. Additionally, [Mother] had determined to keep [Child] home from school despite [Child's] determination to go to school, telling [Child] she would report [Child] as sick. [Child] was not sick and waited until [Mother] fell asleep before exiting the home and walking to school alone. This was done without adult supervision or [Mother's] knowledge at a time other school children would not be going to school or expected to be walking to school. On [April 13, 2015], [Mother] drove [Child] to a gas station, while again exhibiting slurred speech and irate behavior associated with [Mother's]

consumption of alcohol. [Mother] is verbally and emotionally abusive to [Child]. [Mother] fails to provide appropriate supervision over [Child]. [Mother] routinely sleeps long hours in the home without supervising [Child] and fails to provide food for [Child], leaving [Child] to fend for herself to be fed. On the day before the detention, [Child] had candy licorice for dinner. [Child] is fearful of remaining in the home. [Mother] has exhibited a pattern of substance abuse and lack of supervision over [Child] which makes continued residence in the care of [Mother] unsustainable at this time.

(DCS App. pp. 9-10). From Child's removal on April 14, 2015 until a hearing on April 27, 2015, Mother never requested parenting time with Child.

[13]     On April 27, 2015, the trial court held a fact-finding hearing. As to Father, who was represented by counsel at the hearing, the trial court adjudicated Child to be a CHINS based on Father's agreement. The trial court continued the fact-finding hearing as to Mother, who did not appear in person but was represented by counsel. Mother's counsel stated that she was concerned about Mother's competency. Counsel was informed the morning of the hearing that Mother "had kind of a turn for the worse and has been in and out of the Community North Mental Health facility." (Tr. p. 90). However, Mother's counsel did not possess any additional information about Mother's mental state or condition. During Aunt Neu's testimony, the trial court learned that Mother had been involuntarily committed at a mental health facility the previous night. The trial court granted Mother's motion for appointment of *guardian ad litem* and set an additional fact-finding hearing. The trial court held the additional hearing on May 28, 2015. At the conclusion of the additional hearing, the trial court

advised Mother, who was in attendance, that based upon the evidence presented, the trial court was adjudicating Child to be a CHINS. On June 30, 2015, the trial court entered its written CHINS adjudication order stating

> [Mother] has pled guilty to possession of paraphernalia on or about [July 5, 2007] and also to operating a motor vehicle while intoxicated on or about [November 16, 2011] for which she remained on probation until approximately [February 13, 2013]. She was thereafter unsuccessfully discharged from probation. These convictions also demonstrate that [Mother] has ongoing and longstanding substance abuse issues that remain un-remedied as of the time of the conclusion of the fact-finding hearings held in this cause of action. [Mother] rejected multiple and repeated efforts by DCS personnel to work voluntarily on addressing her parenting deficiencies prior to an in-home CHINS proceeding being filed, which later became an [out-of-home] CHINS due to her impaired condition on [April 14, 2015]. Law enforcement has been to [Child's] home extensively and [M]other is known by name to law enforcement officers due to the numerous calls to the home. Mother has been intoxicated on numerous occasions and/or suffering from mental health issues affecting her ability to care for [Child]. Mother has not voluntarily engaged in services offered by DCS without the coercive intervention of the court and such intervention is necessary for the protection and well-being of [Child].

(DCS App. p. 13). On July 27, 2015, the trial court held a dispositional hearing and, on August 5, 2015, the trial court entered its dispositional decree ordering Parents to participate in reunification services.

[14] Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Finality of Appealed Order*

[15] Mother claims that the trial court erred in holding a probable cause hearing in her absence and finding that probable cause existed that Child was a CHINS. DCS, in turn, argues that this appeal should be dismissed because Mother failed to properly invoke our jurisdiction. DCS specifically asserts that the trial court's probable cause order was not a final appealable order, and that Mother should have perfected her appeal and filed an interlocutory appeal pursuant to Ind. Appellate Rule 14. "Only after a dispositional hearing has been held is there a final, appealable order because the disposition finally determines the rights of the parties." *M.K. v. Ind. Dep't of Child Servs.*, 964 N.E.2d 240, 244 (Ind. Ct. App. 2012). However, because a dispositional hearing was conducted, and a final appealable judgment did exist in *M.K.*, the *M.K.* court decided to address the appeal on its merits. *Id.* Here, likewise, the trial court conducted a dispositional hearing, and a final appealable judgment exists. As such, we will address this CHINS appeal on its merits.

### II. *Sufficiency of Evidence*

[16] At the outset, we note that Mother argues that the trial court should not have conducted its probable cause hearing on February 23, 2015 because she arrived and checked in for the hearing but left the courtroom shortly thereafter and never returned. She claims that there was no urgency for the hearing because it was not a detention hearing, which could have justified the urgency. *See* Ind.

Code § 31-37-6-2.[2]  However, Mother does not explain the reason why she left the hearing nor provides us with any authority to support her argument.  *See* App. R. 46(A)(8) (failure to state a cogent argument results in its waiver on appeal).  Further, on March 5, 2015, at the initial hearing on DCS's CHINS petition, Mother admitted that it was her "fault" that she did not stay for the probable cause hearing.  (Tr. p. 42).  As such, we hold that the trial court did not err in conducting the probable cause hearing in Mother's absence.  *See* I.C. § 31-32-5-7 (a parent waives her right to be present at any hearing concerning her child by failing to appear after lawful notice).

[17]  Indiana courts recognize that parents have a fundamental right to raise their children without undue influence from the State, but that right is limited by the State's compelling interest in protecting the welfare of children.  *In re Ju.L.,* 952 N.E.2d 771, 776 (Ind. Ct. App. 2011).  A CHINS proceeding is a civil action in which the State bears the burden of proving by a preponderance of the evidence that a child meets the statutory definition of a CHINS.  *In re N.E.,* 919 N.E.2d 102, 105 (Ind. 2010); I.C. § 31–34–12–3.  Pursuant to Indiana Code section 31–34–1–1, the State must prove that the child is under the age of eighteen and that

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply

---

[2] When asserting this argument, Mother incorrectly cites to Ind. Code section 31-35-5-1.

the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

[18] A CHINS adjudication focuses on the condition of the child. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). A CHINS adjudication does not establish culpability on the part of a particular parent. *Id.* Stated differently, the purpose of a CHINS adjudication is to protect children, not punish parents. *Id.* at 106. Our supreme court has noted that the fact that a child's needs are unlikely to be met without coercive intervention is perhaps the most critical of the considerations when determining whether the State's intrusion into the ordinarily private sphere of the family is warranted. *In re S.D.,* 2 N.E.3d 1283, 1287 (Ind. 2014).

[19] When reviewing the sufficiency of the evidence to support a CHINS adjudication, we will not reweigh the evidence or judge witness credibility. *In re K.D.,* 962 N.E.2d 1249, 1253 (Ind. 2012). We will consider only the evidence favorable to the trial court's judgment and the reasonable inferences drawn therefrom. *Id.* Moreover, because the trial court entered findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A), we may not set aside the findings or judgment unless they are clearly erroneous. *See* T.R. 52(A). We

apply the two-tiered standard of whether the evidence supports the findings and whether the findings support the judgment. *S.D.,* 2 N.E.3d at 1287. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *C.B. v. B.W.*, 985 N.E.2d 340, 344 (Ind. Ct. App. 2013), *trans. denied.* A judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.*

[20] On appeal, Mother asserts that the trial court erred in finding that Child's physical or mental condition was seriously endangered. In support, Mother maintains that Child was not present during Parents' last physical altercation; Mother was the actual victim of the incident; all four prior assessments cited by DCS were not substantiated; no testimony was presented to support 146 calls related to domestic violence in their home; no evidence was presented as to Mother's intoxication on the day of the last altercation; no evidence was shown as to Mother's mental health condition; no evidence was presented to prove that Mother's mental illness interfered with her ability to effectively parent Child; and Mother was not required to cooperate with DCS. Each of these assertions, however, ignores the evidence most favorable to the trial court's determination and, instead, amounts to a request for this court to reweigh the evidence, which we will not do. *See In re Des.B.,* 2 N.E.3d 828, 838 (Ind. Ct. App. 2014).

[21] Our review of the record, in light most favorable to the trial court's decision, indicates that the facts presented to and relied on by the trial court support the

trial court's adjudication of Child as a CHINS. Specifically, Mother has ongoing and longstanding substance abuse issues. She previously pled guilty to possession of paraphernalia and operating a motor vehicle while intoxicated. She failed to address, seek appropriate help, and control her substance abuse issues. Parents' substance abuse issues resulted in numerous domestic violence incidents involving profanity, physical altercations, and law enforcement interventions. In fact, law enforcement received 146 calls related to domestic violence incidents from the family's residence. The police officers knew Mother by name. At least one of these calls was placed by Child out of fear of being physically harmed. Another call was made by the family's neighbor who hosted Child because Child was afraid to go home.

[22] In addition, Mother has mental health issues. She failed to attend one of her hearings due to her involuntary admission into a mental health facility. On one occasion, Mother admitted to a police officer that she was not taking her medication and she suffered from "bipolar disorder and schizophrenia." (Appellant's App. p. 75; Tr. p. 110). On another occasion, Mother saw "dust bunnies" in her residence and summoned law enforcement for help. (Tr. p. 112). Likewise, Aunt Neu testified that Mother was not taking her medication, hallucinated, and saw "snakes[,] possums[,] and all kind of raccoons" in her house. (Tr. p. 158). When Aunt Neu arrived, Mother was "naked, just rumbling through her belongings with really no sense of anything." (Tr. p. 156). Nonetheless, Mother failed to adequately address her mental health issues. Rather, she insists that these issues do not interfere with her parenting

ability, yet her ten-year-old Child is left to fend for herself, eat Twizzlers for dinner, prepare for school, argue with Mother that she needs to go to school, run away to neighbors to seek safety, call the police in fear of Mother's outbursts, and generally experience domestic violence and substance abuse in her home. The trial court is not required to "wait until a tragedy occurs to intervene." *In re Des.B.,* 2 N.E.3d at 838. As such, based on the evidence and our standard of review, we cannot say that the trial court's conclusion that the coercive intervention of the court was necessary is clearly erroneous.

## CONCLUSION

Based on the foregoing, we hold that sufficient evidence supports the trial court's findings, and those findings support the trial court's CHINS adjudication.

Affirmed.

Najam, J. and May, J. concur