# FOR PUBLICATION

ATTORNEY FOR APPELLANT R.K.:

**ROBERTA L. RENBARGER**
Fort Wayne, Indiana

ATTORNEY FOR APPELLANT E.K.:

**CATHERINE S. CHRISTOFF**
Christoff & Christoff Attorneys
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:
DEPARTMENT OF CHILD SERVICES:

**DIANNA L. MEJIA**
Fort Wayne, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

ATTORNEY FOR APPELLEE STEPHEN
GRIEBEL:

**STEPHEN P. GRIEBEL**
Griebel Law Office
Churubusco, Indiana

FILED

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF M.K., I.K., and N.K. )
(MINOR CHILDREN), and )
)
R.K. (MOTHER) and E.K. (FATHER) )
)
    Appellants-Respondents, )
)
      vs. )    No. 02A03-1104-JC-151
)
INDIANA DEPARTMENT OF )
CHILD SERVICES, )
)
    Appellee-Petitioner, )
)
      and )
)
STEPHEN P. GRIEBEL, )
)
    Guardian ad Litem. )

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Charles F. Pratt, Judge
Cause Nos. 02D08-1101-JC-34, 02D08-1101-JC-35, 02D08-1101-JC-36

**January 31, 2012**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

## Case Summary

R.K. ("Mother") and E.K. ("Father") are the parents of M.K., I.K., and N.K. (collectively, "the Children"). In January 2011, the family resided in an apartment in Baltimore, Maryland with Mother's two teenage daughters. Following a series of unfortunate events, including an extended family medical emergency, a neighboring apartment fire, and a travel delay due to snow, Mother and the Children arrived by bus in Fort Wayne in the middle of a January night. After they spent two nights at a shelter and two nights at a motel, Mother stopped by a local United Way office to inquire about temporary assistance, and the Allen County Department of Child Services ("DCS") intervened, seeking to have the Children designated as children in need of services ("CHINS"). Father later arrived in Indiana, and following factfinding and dispositional hearings, the trial court issued an order designating the Children as CHINS.

Mother and Father appeal, challenging the sufficiency of evidence to support the CHINS determination. Finding the evidence insufficient to support the CHINS determination, we reverse and remand for proceedings consistent with this decision.

2

**Facts and Procedural History**

Mother, Father, and the Children are residents of Baltimore, Maryland. Father is employed as a sales representative for three different food companies, and Mother is a substitute teacher in the Baltimore school system. On January 10, 2011, Father left the family's Baltimore apartment to tend to his seriously ill mother in Texas. When he left, he gave Mother at least $250 cash. The couple also had money in Bank of America accounts, which they could access via a debit card. A few days after Father's departure, a kitchen fire in an adjacent unit caused the family's unit to be closed for repairs, and Mother and the Children were forced to temporarily evacuate. After a brief motel stay and a stay at Mother's ex-boyfriend's house, Mother was assaulted by her ex-boyfriend and had to leave. She took the Children on a Greyhound bus to Fort Wayne, where she hoped to contact some relatives whom she had seen listed on an ancestry website and assess the city's possibilities for a possible relocation. Although the original bus schedule indicated a daytime arrival on Thursday, January 20, 2011, a winter storm caused numerous delays en route, and Mother and the Children arrived in Fort Wayne at 4:30 a.m. on Saturday, January 22, 2011. With the bus station closed and no local bus service, Mother borrowed a cell phone to call 311.[1] When a police officer arrived, Mother asked him to transport her and the Children to an inexpensive motel. Instead, the officer transported them to a nearby shelter, where they stayed for two days. On Monday, when local bus service resumed, Mother and the Children went to a motel for the next two days. On January 26, 2011, four days after their arrival in Fort Wayne,

---

[1] 311 was the local number designated in Fort Wayne as a call-for-help number.

Mother stopped by a United Way office to use the restroom. While there, she inquired about possible temporary assistance, and DCS was notified.

On January 27, 2011, DCS filed a petition seeking to have the Children designated as CHINS, essentially alleging that Mother had come to Fort Wayne with no plans for housing and that she and Father had failed to provide basic necessities and stable housing for the Children.[2] DCS amended its petition on February 23, 2011, and the trial court held a factfinding hearing on March 16, 2011, and issued findings of fact and conclusions thereon, designating the Children as CHINS. Mother and Father filed notices of appeal on April 14, 2011. The trial court held a dispositional hearing on May 12, 2011, and issued its final dispositional order on June 20, 2011. The dispositional order incorporated by reference the trial court's earlier findings, which state in part,

> 4. On or about January 22, 2011, [M]other arrived with the children in Fort Wayne, Allen County, Indiana from Baltimore, Maryland.
>
> 5. [Mother] left Baltimore with three of her five minor children without having made arrangements for their shelter upon their arrival in Fort Wayne.
>
> 6. [M]other gave alternate reasons for coming to Fort Wayne. To some, she has claimed that she only came to Fort Wayne for a visit. To others, she stated she was changing her residence. The Court finds that State's Exhibit 1 [Mother's personal letter to the trial court explaining her intentions when she came to Fort Wayne] is dispositive. [M]other stated, "we arrived here to the Fort Wayne area on January 22, 2011 around 4:30 a.m. looking for distant family members, a new career, affordable housing and a new lease on life." She also wrote that her "ex-boyfriend assaulted (her) and was arrested on January 19, 2011". She further noted that, "… I was wholeheartedly ready to settle down[,] work here, and retire and hopefully bring some good cheer to

---

[2] DCS also made a physical abuse allegation concerning an incident in which I.K. threw a tantrum and Mother grabbed the back of his sweater while they were descending the stairs at the homeless shelter. However, the physical abuse allegation lacked evidentiary support and was not part of the trial court's findings.

this town." The Court therefore finds that [M]other's intent was not to visit Fort Wayne, but, rather, to relocate here.

7. Because she had no arrangements for housing [M]other was referred to a local shelter.

8. Between January 22, 2011 and January 28, 2011, [M]other relocated with the children from the shelter to hotels. She has not been able to maintain housing for the children.

9. The children had been previously removed from the care of the parents in the State of Texas. They claim that through the personal intervention of the Texas governor, the children were restored to their care. There is no evidence to substantiate their assertion.

10. [F]ather also claimed that after the restoration of the children to their care, the family returned to Baltimore, Maryland. He testified that they remained there until January, 2011. However, [M]other stated they resided in California for a period. As [M]other gave her contradictory testimony the Court observed [F]ather to respond with consternation. The Court finds and concludes therefore that the Respondent parents' testimony with regard to their stability is not reliable.

11. Notwithstanding the past involvement of child protective services in Texas, [F]ather again separated himself from [M]other and the children.

12. [F]ather knew or should have known that [M]other relocated to Fort Wayne without provison [sic] for the children's care.

13. From the observations of the parents' demeanor and the contradictions in their testimony, the Court has concern with regard to their mental health.[3]

---

[3] Although the Guardian ad Litem cites Mother's refusal to submit to a mental health evaluation as evidence of mental problems, GAL Br. at 17, we note that the record contains no evidence of any previous diagnosis of mental illness and Mother admitted only that she had experienced some depression in the past.

5

14.  The Court finds that Petition allegations 4(A)1, 2, 3, 4, 6 and 8 are true and that 4(B)1, 5, and 6 are true.[4]

Father's App. at 134-35.

This appeal ensued.  Additional facts will be provided as necessary.

## Discussion and Decision

### I.  Finality of Appealed Order

DCS argues that this appeal should be dismissed because Mother and Father filed their notices of appeal before the trial court issued its final dispositional order on the CHINS petition, and the appeal was not otherwise accepted on an interlocutory basis.[5]  "Only after a dispositional hearing has been held is there a final, appealable order because the disposition finally determines the rights of the parties."  *In re J.V.*, 875 N.E.2d 395, 399 (Ind. Ct. App. 2007), *trans. denied* (2008).  However, the *J.V.* court decided to "address th[e] appeal on the merits because a dispositional hearing was conducted, and a final appealable judgment exists."  *Id.*  Likewise, here, the trial court conducted a dispositional hearing, and a final appealable judgment exists.  As such, we will address this CHINS appeal on its merits.

---

[4]  CHINS Petition Allegations 4(A)1 and 4(B)1 state respectively that Mother and Father are the parents of M.K., I.K., and N.K.  Allegations 4(A)2, 3, 4, 6, and 8 state the following with respect to Mother: that she arrived in Fort Wayne with the three children on January 22, 2011; that upon arrival, she contacted law enforcement and reported that she and the children had no place to stay; that between January 22 and January 28, 2011, she moved in and out of hotels and shelters, but was unwilling or unable to secure stable housing; that she relocated to Fort Wayne without a plan or means to provide basic necessities for the children; and that her children had previously been removed from her care in 2008 in Texas.  Allegations 4(B)5 and 6 state the following with respect to Father:  that he failed to insure that the three children were provided with the basic necessities; and that he knew or should have known of the children's living conditions, failed to protect them, and failed to provide adequate supervision.  Mother's App. at 41-42.

[5]  We note that the motions panel of this court denied DCS's motion to dismiss before the appeal was fully briefed and acknowledge that we may revisit such a ruling.

6

## II. Sufficiency of Evidence

Mother and Father challenge the sufficiency of evidence supporting the trial court's order designating the children as CHINS. At the outset, we note that Mother and Father have filed separate appellant's briefs. However, since a CHINS determination is based on the status of the children, we need not conduct a separate analysis concerning each parent. *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010). Unlike in termination proceedings, a CHINS adjudication need not establish culpability on the part of either or both parents. *Id*. at 105. Instead, a CHINS adjudication focuses on the condition of the children. *Id*. In this vein, we note that while the acts or omissions of one parent can cause a condition that creates the need for court intervention, the purpose of a CHINS adjudication is to protect children, not to punish parents. *Id*. at 105-06.

"[A] primary purpose and function of the State is to encourage and support the integrity and stability of an existing family environment and relationship." *Id*. at 106 (citation and quotation marks omitted). Although "the right to raise one's children without undue interference from the State is protected by the Fourteenth Amendment to the United States Constitution, a parent's constitutionally protected right to raise his or her child is not without limitation." *In re A.C.*, 905 N.E.2d 456, 461 (Ind. Ct. App. 2009). "Specifically, the state has a compelling interest in protecting the welfare of the child by intervening in the parent-child relationship when parental neglect, abuse, or abandonment are at issue." *Id*.

Here, the trial court's dispositional order incorporates findings of fact and conclusions thereon. As such, we apply a two-tiered standard of review. *In re A.H.*, 913 N.E.2d 303, 305

(Ind. Ct. App. 2009). First, we determine whether the evidence supports the findings; then, we determine whether the findings support the judgment. *Id.* We reverse the judgment only if it is clearly erroneous. *Id.* Findings are clearly erroneous if the record contains no facts to support them, either directly or by reasonable inference. *In re A.C.*, 905 N.E.2d at 461. A judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* We neither reweigh evidence nor assess witness credibility; rather, we consider the evidence and reasonable inferences most favorable to the judgment. *Id.* While we defer substantially to the trial court's findings of fact, we do not defer to its conclusions of law. *Id.*

Indiana's CHINS statute states in part,

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1.

This case involves an intact family that experienced unusual circumstances. First, Father had to leave Baltimore to tend to his seriously ill mother in Texas. Shortly thereafter, through no fault of their own, Mother and the Children were temporarily displaced from their

8

Baltimore apartment by a kitchen fire in an adjacent apartment. This circumstance disconnected Mother from her landline phone, Father's only means of communicating with her. After enduring a couple days of subpar motel accommodations,[6] Mother sought lodging with her ex-boyfriend and father of her two teenage daughters, only to be assaulted by him. It was only then that Mother decided to take her three youngest children to Fort Wayne to contact relatives she had discovered through her ancestry research. A winter storm intervened, causing delays en route, and Mother and the Children ended up arriving in Fort Wayne in the pre-dawn hours on a Saturday. Because no local bus service was available during those hours and Mother had no cell phone, she sought transportation from other passengers and then from police. Although Mother had brought money for a motel, the officer took her and the Children to a nearby shelter instead. Notwithstanding, at her earliest opportunity, she took the Children from the shelter to a motel as originally planned.

This evidence does not support the trial court's finding that Mother relocated to Fort Wayne without a plan for housing and was unwilling or unable to provide the Children with stable housing. First, the uncontroverted evidence indicates that Father was employed as a sales representative, that Mother worked as a substitute teacher, and that Mother came to Fort Wayne with $250 cash for lodging and money in her savings account. Moreover, the record is replete with evidence that Mother was not relocating to Fort Wayne on January 19, 2011. Mother steadfastly asserted that she took the Children to Fort Wayne to look up relatives

_____

[6] Mother testified that the motel was expensive and dirty and that the children showed signs of bed bug bites. Petitioner's Ex. 1.

while the family was temporarily displaced from its fire-damaged Baltimore apartment. In short, Mother and Father did have a stable housing arrangement for the Children—in Baltimore—and the family's inability to live there in late January 2011 was due to a neighbor's kitchen fire. A fire department report confirms the temporary displacement, *see* Respondent's Ex. C, and Mother testified that while in Fort Wayne, she stayed in contact with her Baltimore landlord regarding the progress of repairs to the apartment. Tr. at 44. To the extent that the trial court relies on Mother's letter as evidence of intent to relocate, we find that, at *most*, she traveled to Fort Wayne to assess the city's possibilities as a future home.[7] We also note that she left her two teenage daughters in Baltimore instead of bringing them to Fort Wayne, that the rent on her Baltimore apartment was paid through at least the end of February, and she and Father still had a valid lease on that apartment. Consequently, Mother was not "unwilling or unable to secure stable housing," as DCS asserts and the trial court found. Mother's App. at 41. Instead, the most that can be said is that Mother arrived in Fort Wayne without a reservation for lodging. In this vein, we note that due to weather delays, she would have been unable to keep that reservation.

Moreover, Mother had a plan: to use her cash to obtain lodging at an inexpensive motel. She and the Children were not "in and out of hotels and shelters," as DCS alleged and the trial court found. *Id.* To the extent that she had to move the Children at all, it was due to

---

[7] In the letter, Mother stated that her friend from Indianapolis had spoken favorably of the Fort Wayne area and that she was "wholeheartedly ready to settle down[,] work hard, retire and hopefully bring some good cheer to this town." Petitioner's. Ex. 1. She immediately followed this statement by emphasizing, "I explained to [DCS case manager] Mr. Vanderwall that I had housing back in Md. and that I was looking at all of my prospects to interview before I had made any commitments to staying here." *Id.*

10

the officer's refusal to take her to an inexpensive motel, as she had planned, and she repeatedly emphasized that she never intended to go to a shelter. Tr. at 18, 94-96. She packed ample supplies for the Children during their stay in Fort Wayne, and DCS Case Manager Graydon Vanderwall testified that the Children appeared to be fed and properly clothed in winter attire. *Id*. at 80. Mother had cash to pay for a motel, as well as money in her bank account. In addition, Father's sales representative job enabled him to work from different locations, including Texas. Mother also provided documentation regarding additional income from social security payments for her two teenage daughters.

In sum, the Children were removed from Mother and Father following a series of unfortunate and unforeseen events. While we appreciate DCS's concern for the well-being of children, its overzealousness in this case has caused great disruption to an intact family in which the parents tried their best to cope with challenging circumstances. In other words, the record here simply does not support a conclusion that, in January 2011, the Children were endangered by any neglect on the part of Mother or Father or that Mother and Father were unable or unwilling to supply them with stable housing, food, clothing, care, or supervision.[8] As such, we conclude that the CHINS designation was clearly erroneous. Accordingly, we reverse and remand for proceedings consistent with this decision.

---

[8] To the extent that the trial court noted in its findings a previous incident in Texas in which the Children were temporarily removed from Mother and Father, we note that the evidence surrounding the Texas removal was sketchy at best and that the incident seemingly stemmed, at least in part, from bad blood between Mother and Father's mother, possibly concerning racial issues. Tr. at 54. Also, to the extent the Guardian ad Litem cites Father's evasiveness or refusal to answer questions as evidence supporting the judgment, GAL Br. at 17, we note that Father's reticence pertained to disclosing specific facts surrounding the events in Texas involving his own mother's treatment of Mother, based seemingly on racial grounds. *Id*. at 56.

11

Reversed and remanded.

MAY, J., and BROWN, J. concur.