## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 07 2016, 9:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT J.C.

Ruth Johnson
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLANT S.P.

Ruth Johnson
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

Jill M. Acklin
McGrath, LLC
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of D.C., C.C., and I.S., Children in Need of Services,

S.P., Mother, and J.C., Father,

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

and

Child Advocates, Inc.,

*Co-Appellee (Guardian ad Litem).*

November 7, 2016

Court of Appeals Case No. 49A05-1602-JC-208

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge The Honorable Rosanne Ang, Magistrate

Trial Court Cause Nos. 49D09-1508-JC-2507 49D09-1508-JC-2508 49D09-1508-JC-2509

**Kirsch, Judge.**

S.P. ("Mother") and J.C. ("Father") appeal from the juvenile court's order adjudicating the children, D.C., C.C., and I.S. (collectively, "the Children"), to be children in need of services ("CHINS"). Father raises two issues for our review, and Mother raises one issue, which we restate and consolidate as follows:

> I. Whether the juvenile court's CHINS adjudication order was clearly erroneous because the findings were not supported by the evidence and the conclusions were not supported by the findings; and

> II. Whether D.C. and C.C. were improperly detained by the juvenile court.

We affirm.

## Facts and Procedural History

Mother and Father are the parents of two children, D.C., born on October 21, 2000, and C.C., born on October 24, 2004. Mother is also the parent of I.S., born on February 13, 2008; however, the father of I.S. is T.S. Paternity was established as to all of the Children, but neither Father nor T.S. paid Mother financial support for their respective Children before the CHINS case was initiated. Mother had physical custody of the Children, and they lived in Marion County.

On August 16, 2015, the Indiana Department of Child Services ("DCS") received a report that I.S. was hospitalized at Riley Hospital for Children in Indianapolis ("Riley Hospital") and had been intubated and that Mother had engaged in fights with hospital staff and family members and had been asked to leave the hospital. DCS family case manager ("FCM") Olyvia Hoff ("FCM Hoff"), an assessment worker for the fatality and near-fatality team,[1] went to Riley Hospital to investigate the report.

About two weeks prior to I.S. being hospitalized, Mother had traveled to Kentucky and stayed with T.S. for about six days. During the assessment, Mother told FCM Hoff that I.S. began to get sick while she was in Kentucky,

---

[1] FCM Hoff testified at the CHINS hearing that near fatalities are situations involving children who are "intubated or in the ICU." *Tr.* at 45-46.

but Mother believed it was just because she was not home. *Tr.* at 50. Mother testified that, when she went to Kentucky, she left the Children in the care of her mother ("Grandmother") and her sister ("Aunt"); however, Mother did not mention Aunt to FCM Hoff and only said that Grandmother took care of the Children. *Id.* at 27, 53. Mother told FCM Hoff that Grandmother "is a paranoid schizophrenic and also had multiple health issues." *Id.* at 53. Mother also stated that Grandmother sometimes "is unable to even care for herself." *Id.* DCS believed that Mother's decision to leave the Children with Grandmother was a concern due to the fact that Mother was aware of Grandmother's health conditions and that Grandmother could not care for herself at times. *Id.* at 96-97.

[6] Mother stated to FCM Hoff that when she returned to Indiana from Kentucky, I.S. went to school Monday and Tuesday of that week, but was sent home by the school nurse on Wednesday "for feeling ill." *Id.* at 50. I.S. stayed home the rest of Wednesday and Thursday, but returned to school on Friday "feeling fine." *Id.* at 50-51. He did not begin to feel ill again until Sunday night, and his condition "got extremely worse after Monday"; when Mother attempted to move I.S., "he would start just screaming in pain." *Id.* at 51. Mother told FCM Hoff that she was "unsure of why [I.S.] was sick or what happened." *Id.* On August 11, 2015, which was Tuesday, Mother took I.S. to Community East Hospital, where he was admitted and then transferred to Riley Hospital on August 12. I.S. underwent surgery, but Mother said she was not told "what the surgery was for" and that "they needed to open him up immediately and find

out what was going on with him." *Id.* at 10. Mother stayed with I.S. at Riley Hospital for about five or six days and observed a tube in his mouth or nose, and during that period of time, I.S. was not conscious. I.S. had to undergo at least one other surgery while hospitalized. The medical personnel at Riley Hospital determined that I.S.'s injuries were "non-accidental." *Id.* at 110. Mother acknowledged that I.S. was in her care and custody for the ten days prior to his admission to Riley Hospital, but did not observe any accidents and was not aware of any severe blows to his abdomen that occurred in that period of time. *Id.* at 25, 33-34, 58. Although Mother was "told there would be training" for taking care of I.S. after his discharge from Riley Hospital, she did not inquire about any training. *Id.* at 123.

[7] While I.S. was at Riley Hospital, Mother was involved in an altercation with a nurse. Mother told the nurse that she no longer wanted the nurse to work on I.S. because the nurse "removed the catheter wrong." *Id.* at 36. Mother told FCM Hoff that the nurse tried to remove the catheter, which woke I.S. from his sedation, and he started screaming. *Id.* at 51. Mother denied threatening the nurse, but merely asked for her not to be on I.S.'s care. *Id.* Mother was also involved in an altercation with members of T.S.'s family. Mother informed FCM Hoff that one of the relatives yelled at Mother and threatened her in front of the Children, so Mother "threatened her back and pushed her away." *Id.* at 51-52. After these altercations, Riley Hospital asked Mother to leave for twenty-four hours, but she did not return for four days because "they called DCS on [her]." *Id.* at 38.

[8]     I.S. was hospitalized from August 11 until September 18, 2015. At the time of his discharge, I.S. was placed with his paternal aunt. Prior to his discharge from Riley Hospital, I.S. was interviewed by a forensic interviewer. During the interview, only the forensic interviewer was present with I.S., but FCM Hoff was able to observe through a window. At one point in the interview, FCM Hoff observed I.S. "lay his head down on the table," and based on this observation, she was concerned that I.S. did not feel safe in Mother's care. *Id.* at 62-63.

[9]     DCS was concerned with placing the Children with Mother based on Mother's lack of supervision, lack of knowledge about how I.S. was injured, anger issues, and decision to leave the Children with Grandmother, who had physical and mental health issues. Mother had also admitted marijuana use, and T.S. was not a good placement option because he worked out of state regularly. DCS had some concerns about Father, but not about placing D.C. and C.C. in his care. Father tested positive for marijuana during the assessment phase and again on the date of the fact-finding hearing, and DCS pursued random drug screens to address these concerns.

[10]    On August 20, 2015, DCS filed a petition alleging the Children to be CHINS. At the initial and detention hearing, the juvenile court ordered the removal of the Children from Mother's care and placed D.C. and C.C. with Father, while I.S. was ordered to have continued placement at Riley Hospital with authorization for release to relative care or foster care upon his release. The juvenile court ordered detention of the Children for their protection, and a

guardian ad litem ("GAL") was appointed. D.C. and C.C. remained in Father's care for the duration of the CHINS case, and the GAL reported that they were doing well in their placement. When I.S. regained consciousness in the hospital, he did not want to talk about the incident that caused him to be hospitalized; when he was released from Riley Hospital, he was placed with a paternal aunt, where he remained for the duration of the CHINS case. As part of the CHINS proceedings, Mother agreed to participate in random drug screens, home-based case management, home-based therapy, and a mental health evaluation.

[11] On November 16, 2015, a fact-finding hearing was held on the CHINS petition. At the hearing, Father did not have custody of D.C. and C.C., but he had filed a motion to modify custody before the hearing. At the conclusion of the fact-finding hearing, the juvenile court issued its findings, conclusions, and order adjudicating the Children to be CHINS. A dispositional hearing was held on January 12, 2016. At this hearing, DCS recommended random drug screens for Father due to his testing positive for marijuana in the past; however, no other services were ordered for Father, and DCS had no safety concerns regarding the placement of D.C. and C.C. in Father's care. As part of the dispositional order, the juvenile court ordered Mother to participate in home-based case management, home-based therapy, psychological evaluation, and to follow up on all recommendations. D.C. and C.C. were to remain in the care of Father, and I.S. was ordered to remain in relative care. Father and Mother now appeal.

# Discussion and Decision

## I. Sufficiency of the Evidence

[12] When a juvenile court's order contains specific findings of fact and conclusions thereon, we engage in a two-tiered review. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014) (citing *In re T.S.,* 906 N.E.2d 801, 804 (Ind. 2009)). First, we determine whether the evidence supports the findings, and then, we determine whether the findings support the judgment. *Id.* Findings are clearly erroneous when there are no facts or inferences drawn therefrom that support them. *Id.* A judgment is clearly erroneous if the findings do not support the juvenile court's conclusions or the conclusions do not support the resulting judgment. *Id.* We reverse only upon a showing that the decision of the juvenile court was clearly erroneous. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012).

[13] When determining whether sufficient evidence exists in support of a CHINS determination, we consider only the evidence most favorable to the judgment and the reasonable inferences therefrom. *In re S.D.,* 2 N.E.3d 1283, 1287 (Ind. 2014). This court will not reweigh the evidence or reassess the credibility of the witnesses. *Id.* at 1286.

[14] DCS had the burden of proving by a preponderance of the evidence that the Children were CHINS. Ind. Code § 31-34-12-3. Indiana Code sections 31-34-1-1 through 11 specify the elements of the CHINS definition that the State must prove:

(1) the child is under the age of 18;

(2) one or more particular set or sets of circumstances set forth in the statute exists; and

(3) the care, treatment, or rehabilitation needed to address those circumstances is unlikely to be provided or accepted without the coercive intervention of the court.

*In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). Here, the juvenile court adjudicated the Children to be CHINS pursuant to Indiana Code section 31-34-1-1, which provides:

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Therefore, this statute requires "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and . . . that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287.

In the present case, Father and Mother argue that the juvenile court's order adjudicating the Children as CHINS was clearly erroneous and was not supported by sufficient evidence. Specifically, Father and Mother challenge several of the juvenile court's findings, arguing that the evidence did not support those findings. However, there are also several findings that Father and Mother do not challenge. To the extent Father and Mother do not challenge certain of the juvenile court's findings of fact, these unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by trial court resulted in waiver of argument that findings were clearly erroneous), *trans. denied*.

Both Father and Mother challenge Finding 6, which stated:

> In July of 2015, [Mother] left the children in the care of [Grandmother] while she went out of state to stay with [T.S.]. Despite having knowledge that [Grandmother] has a diagnosis of paranoid schizophrenia, has multiple health issues, and is at times unable to care for herself, [Mother] left the children in the care of [Grandmother] for six days.

*Appellant's App.* at 124.[2]

Although Mother acknowledges that a DCS employee testified that Mother told her that Grandmother is unable to care for herself sometimes, Mother contends

[2] Father and Mother filed separate appendices. Unless otherwise notes, we cite to Father's appendix merely as Appellant's Appendix.

that the "intended inference that [Mother] was neglectful in leaving" the Children in Grandmother's care was not supported by the record because the evidence did not "reflect the extent of [Grandmother's] being 'unable to care for herself,'" what Grandmother does in those situations, and whether Grandmother "was in such a state when [Mother] went to Kentucky." *Appellant Mother's Br.* at 17. Initially, we find that Mother's argument that there was insufficient evidence to support this finding is merely a request for this court to reweigh the evidence because Mother concedes that FCM Hoff testified that Mother had told her about Grandmother's health issues and inability to take care of herself. *Id.* (citing *Tr.* at 53). Thus, the record supports the finding. Additionally, Mother claims that the finding shows that the juvenile court found her neglectful. However, the finding does not actually state that Mother was neglectful; it states that Mother left the Children in Grandmother's care for six days, knowing of Grandmother's mental and physical health issues. Mother also argues that the evidence did not support the finding because Grandmother did not live in the home with the Children; however, the evidence established that Grandmother stayed at Mother's home with the Children while Mother was in Kentucky. *Tr.* at 27.

[18] Both Mother and Father assert that the evidence did not support Finding 6 because Mother left the Children in the care of both Grandmother and Aunt. Although Mother did testify that she left the Children in Aunt's care, *tr.* at 27, the trial court was not required to believe that testimony. FCM Hoff testified that Mother told her only that she left the Children with Grandmother and did

not mention Aunt. *Id*. at 53. We will not reweigh the evidence or reassess the credibility of the witnesses. *In re S.D.,* 2 N.E.3d at 1286. The evidence supported Finding 6.

[19] Mother next challenges a portion of Finding 7, which stated in pertinent part: "Following [Mother's] return to the state, [I.S.] was in good health for approximately one and a half weeks." *Appellant's App*. at 124. Mother argues that the evidence did not "quantitatively" support this finding. *Appellant Mother's Br*. at 18. However, Mother testified at the fact-finding hearing that she had been home "for maybe a week and a half" before I.S. was taken to the hospital, and she described his health as "good" during that period of time. *Tr*. at 30. Therefore, the evidence supported Finding 7.

[20] Mother also takes issue with Finding 9 and contends it was not supported by sufficient evidence. Finding 9 stated, "During the DCS assessment of the children, the DCS assessment worker had concerns that [I.S.] did not feel safe in the home of his mother." *Appellant's App*. at 124. Mother asserts that this finding "is an apparent reference to . . . testimony from the DCS assessment worker[] regarding her observation of the forensic interview of I.S." and that the juvenile court was speculating in making the finding because an inference cannot be made that I.S. felt unsafe from the testimony of FCM Hoff. *Appellant Mother's Br*. at 18. Contrary to Mother's contention, the juvenile court was not making a finding that I.S. actually felt unsafe in Mother's home in Finding 9; instead, the juvenile court was merely making the finding that FCM Hoff had such concerns. During her testimony at the fact-finding hearing, FCM Hoff

stated that she observed I.S. "lay his head down on the table" during the forensic interview, and based on this observation, she was concerned that I.S. did not feel safe in Mother's care. *Id*. at 62-63. Therefore, Finding 9 was supported by sufficient evidence.

[21] Mother next claims that Finding 10 was unclear. Finding 10 stated, "[Mother] has no knowledge of the cause of [I.S.'s] injury and did not know the nature of his follow-up care on the date of the fact-finding." *Appellant's App*. at 124. Mother concedes that she admitted she was not aware of what caused I.S.'s injury, *tr*. at 19, but contends that there is no inference to be made from the fact that Mother did not know how the injury occurred other than the injury was "non-accidental." *Tr*. at 110. Mother further argues that there is no apparent inference given as to the language of Finding 10 stating that she did not know the nature of I.S.'s follow-up care. She states that it is logical that she would not know the nature of I.S.'s care at the fact-finding hearing since I.S. had not been in her care for nearly three months at that time.

[22] As to the first part of Finding 10, Mother concedes, and the evidence at the fact-finding hearing showed, that Mother testified that she had no knowledge of the cause of I.S.'s injury. *Appellant Mother's Br*. at 19; *Tr*. at 19. As to the second portion of Finding 10 concerning Mother's knowledge of the follow-up care of I.S., Mother testified that she knew very little about I.S.'s injuries, the treatment he received in the hospital, and what care he needed once he left the hospital. *Id*. at 12-13, 15-16, 94-95, 123. Although Mother asserts that it is not surprising that she did not know the nature of I.S.'s follow-up care at the fact-finding since

I.S. had been out of her care for almost three months at that time, the evidence shows that she knew hardly anything about I.S.'s condition and care he needed at the time he was in the hospital and that she did not wish to learn about his follow-up care, choosing not to attend the training offered by Riley Hospital. *Id.* at 94-95. The evidence supported Finding 10.

[23] Father argues that the evidence did not support Finding 11, which stated, "[Father] is not currently the custodial parent of [D.C.] and [C.C.] and did not regularly support the children prior to the filing of the action." *Appellant's App.* at 124. Father contends that the evidence did not support Finding 11 because there was no evidence that he was ever ordered to pay support to Mother for D.C. and C.C. However, the juvenile court's finding did not state anything about Father having been ordered to pay support to Mother. As Father concedes, Mother testified at the fact-finding hearing that Father did not "pay child support or provide financial support" to her prior to D.C. and C.C. being placed with him. *Tr.* at 6. Father also asserts that, although he did not provide money directly to Mother, he supported D.C. and C.C. in other ways. Father specifically points to testimony by a DCS case worker that Father had regular contact with D.C. and C.C. and they had a bedroom at his house. *Id.* at 101. However, having regular contact does not establish that Father was "regularly support[ing] the [C]hildren prior to the filing of the [CHINS] action." *See Appellant's App.* at 124. The evidence supported Finding 11.

[24]  Father next claims that the trial court's conclusions were not supported by the evidence or the findings.  He specifically argues that the findings did not support the juvenile court's Conclusion 12, which stated:

> [D.C.], [C.C.], and [I.S.]'s physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision.  Despite having knowledge that [Grandmother] is unable to fully care for herself, [Mother] left the children for nearly one week with [Grandmother].

*Appellant's App*. at 124-25.  Father contends that the evidence presented indicated that the Children were provided food, clothing, shelter, medical care, education, and supervision by both Mother and Father.  He also asserts that the evidence showed that Mother left the Children in the care of Grandmother and Aunt while she went out of town and that Grandmother was fine and taking her medications.

[25]  In the present case, the evidence showed that I.S. suffered a serious injury that was deemed non-accidental while he was in the care and custody of Mother.  Mother claimed to have no knowledge of how the injury occurred and had no basic understanding of what I.S.'s injuries were and what his medical needs entailed.  Mother was also the custodial parent of D.C. and C.C. as well as I.S.  She exhibited anger issues and admitted to marijuana use.  Additionally, the evidence presented at the fact-finding hearing established that Mother left the Children in Grandmother's care when Mother left town for six days and that

Grandmother suffered from various mental and physical health issues and had trouble taking care of herself at times. Based on this evidence, the juvenile court could reasonably infer that the Children were not safe in Mother's care. Conclusion 12 was not clearly erroneous.

[26] Father also argues that the findings did not support the juvenile court's Conclusion 14, which stated: "[D.C.], [C.C.], and [I.S.] need care, treatment, or rehabilitation that they are not receiving and are unlikely to be provided or accepted without the coercive intervention of the court." *Id*. at 125. He contends that evidence did not support this conclusion because neither D.C. and C.C. nor he required services through DCS as a part of the CHINS proceedings. Father also asserts that there was no evidence that, if required, he would have refused services, therefore, no coercion by the juvenile court was necessary.

[27] "The purpose of the CHINS adjudication is to 'protect the children, not punish parents.'" *In re K.D.*, 962 N.E.2d at 1255. "The process of the CHINS proceeding focuses on 'the best interests of the child, rather than guilt or innocence as in a criminal proceeding.'" *Id.* There are many situations in which a child may be adjudicated a CHINS, including: through no fault of the parent, such as a missing child, or a child endangering his own health; when only one parent may be responsible as when physical abuse of a child occurs at the hands of only one parent; or based on both parents' behavior, which is frequent in neglect circumstances. *Id.*

[28] CHINS statutes do not require that a court wait until a tragedy occurs to intervene. *Roark v. Roark,* 551 N.E.2d 865, 871 (Ind. Ct. App. 1990). Once the juvenile court concludes that a parent's action or omissions have created a CHINS condition the court may infer that such actions and condition would continue in the absence of court intervention. *In re M.R.,* 452 N.E.2d 1085, 1089 (Ind. Ct. App. 1983) ("Having concluded that Mother's actions were detrimental to her children's well-being, the trial court was entitled to believe that such conduct would continue in the absence of court intervention.").

[29] Father is correct in his contention that DCS did not order him or D.C. and C.C. to participate in services. However, when D.C. and C.C. were removed from Mother's custody and placed with Father, they were placed with him on a trial home visit because Father did not have custody of D.C. and C.C. *Appellant's App.* at 34. Therefore, the juvenile court's intervention was necessary to facilitate the trial home visit placement of D.C. and C.C. Without the juvenile court's intervention, D.C. and C.C. would have been returned to Mother's custody because Father did not have custody of them. Although Father had filed a motion to modify custody of D.C. and C.C. at the time of the fact-finding hearing, DCS asserts that, in order for the juvenile court to modify custody, it first had to adjudicate D.C. and C.C. as CHINS. Under Indiana Code section 31-30-1-13, a juvenile court may modify custody for a child who is the subject of a CHINS proceeding, and an order modifying custody survives the termination of the CHINS proceeding. Ind. Code § 31-30-1-13(a), (d). However, in order to modify custody, the juvenile court must have jurisdiction

over the child, which means the juvenile court must have determined the child to be a CHINS and continued to a dispositional hearing. The dispositional hearing is where the juvenile court finally determines the rights of the parties. *M.K. v. Ind. Dep't of Child Servs.*, 964 N.E.2d 240, 244 (Ind. Ct. App. 2012). Therefore, the juvenile court did not err in waiting to rule on Father's motion to modify custody until after the CHINS adjudication and disposition. We conclude that the evidence supported Finding 14. The juvenile court's conclusion that the coercive intervention of the court was necessary was not clearly erroneous.

## II. Inappropriate Detention

[30] Under Indiana Code section 31-34-5-3,

> (a) The juvenile court shall release the child to the child's parent, guardian, or custodian. However, the court may order the child detained if the court makes written findings of fact upon the record of probable cause to believe that the child is a child in need of services and that:

> (1) detention is necessary to protect the child; . . . .

Ind. Code § 31-34-5-3(a)(1). Father argues that the juvenile court erred when it ordered and continued the detention of D.C. and C.C. throughout the CHINS proceedings. He asserts that, in each of the orders for detention, the juvenile court stated that detention was being ordered for the protection of D.C. and C.C., but that the juvenile court did not state why D.C. and C.C. needed protection while in Father's care. Father contends that the juvenile court

unnecessarily detained D.C. and C.C. in violation of the Indiana Code and his constitutional rights.

[31] Initially, we note that Father fails to cite to any portion of the record where he raised this issue with the juvenile court or objected to the continued detention of D.C. and C.C. During the CHINS proceedings, Father never objected to the detention order or to the lack of findings to support such detention. Issues not raised at the trial court are waived on appeal. *In re B.R.*, 875 N.E.2d at 373 (citing *Cavens v. Zaberdac,* 849 N.E.2d 526, 533 (Ind. 2006)). "In order to properly preserve an issue on appeal, a party must, at a minimum, 'show that it gave the trial court a bona fide opportunity to pass upon the merits of the claim before seeking an opinion on appeal.'" *Cavens*, 849 N.E.2d at 533 (quoting *Endres v. Ind. State Police,* 809 N.E.2d 320, 322 (Ind. 2004)). We, therefore, find this issue to have been waived on appeal.

[32] Waiver notwithstanding, we will address Father's argument. Although Father contends that the juvenile court's order of detention deprived him the "right to establish a home and to parent both of his children," the evidence shows, and Father concedes, that D.C. and C.C. have remained in his care and physical custody throughout the CHINS proceedings. *Appellant Father's Br*. at 27. Father has not pointed to any instance in the record where the juvenile court's order interfered with his parenting of D.C. and C.C. Therefore, he has not shown that he was harmed by the juvenile court's detention orders.

[33] Affirmed.

May, J., and Crone, J., concur.