# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 09 2019, 9:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew R. Falk
Hendricks County Public
Defender's Office
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of A.W. (Child in Need of Services)

and

K.W. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

December 9, 2019

Court of Appeals Case No. 19A-JC-1375

Appeal from the Hendricks Superior Court

The Hon. Karen M. Love, Judge

Trial Court Cause No. 32D03-1901-JC-3

**Bradford, Judge.**

# Case Summary

[1]     A.W. ("Child") was born in 2001 to K.W. ("Mother") and Father.[1]  In late 2018, Child, who had been living with Father, came to live with Mother in Hendricks County.  On January 14, 2019, the Indiana Department of Child Services ("DCS") visited the home and found it to be filthy and in poor condition, observed drug paraphernalia and prescription drugs in the open, and discovered very little food in the home.  DCS removed Child from the home and petitioned the juvenile court to find her a child in need of services ("CHINS"), and the State charged Mother with several crimes.  After a hearing, the juvenile court adjudicated Child to be a CHINS.  Mother contends that the juvenile court's adjudication is clearly erroneous.  Because we disagree, we affirm.

# Facts and Procedural History

[2]     Child was born on August 10, 2001.  Prior to DCS's involvement, Child lived with Father in Illinois from August of 2018 until December of 2018.  At that time, Father told Mother that if she did not take Child in, he was going to "put her into the system."  Tr. Vol. II p. 42.  Consequently, Child moved to Indiana to live with Mother, who, on December 11, 2018, had been evicted from her apartment in Jamestown.  When Child moved in with Mother, they were residing in a home with three other adults and two other children.

---

[1] Father does not participate in this appeal.

[3]     On January 14, 2019, DCS received a report alleging that drugs were being dealt out of the home in which Child was living and that the home was in a poor condition. DCS family case manager ("FCM") Tiffany King visited the home that day. When FCM King visited the home, she observed cigarette butts on the floor, drug paraphernalia, beer cans and Crown Royal bottles, prescription drug bottles, a ceiling that was falling in, holes in the floors and walls, feces in the bathtub and on the bathroom floor, moldy food items, cobwebs throughout the house, and a smoky living room. The only food in the home was one onion, some butter, hamburger, and three cans of other food. Other than the living room, which had a fireplace, the rest of the home was very cold, "probably 25 to 30 degrees[.]" Tr. Vol. II p. 59. Mother was not in the home when FCM King was there, but King was able to speak with Mother by telephone. Mother said that she was on her way back from Illinois, the condition of the home was not poor when she left, and she had not used drugs.

[4]     Child's hair was matted, her teeth appeared to have not been recently brushed, and her hands and clothing were very dirty. Child told FCM King that she had not been to school since she had lived with Father in Illinois. Child told FCM King that she had depression and other mental-health needs but that she had not been taking her medication for them. Authorities arrested the two adults who were in the home at the time, and DCS removed Child and the other minor children and placed Child in foster care.

[5]     On January 16, 2019, DCS filed a petition alleging Child was a CHINS. The same day, the State charged Mother with Level 6 felony neglect of a dependent,

Level 6 felony maintaining a common nuisance, and Class C misdemeanor possession of paraphernalia. On January 17, 2019, DCS moved for leave to amend its petition along with an amended petition alleging that the adults in the home where Child was living were using methamphetamine, law enforcement found methamphetamine pipes in the home, the home was in a deplorable condition with no working heat or electricity and feces in the bathtub and on the floor, there were alcohol and prescription pill bottles strewn throughout the house within reach of Child and other children in the home, Child appeared dirty like she had not bathed for several days, and Child was not enrolled in school and had not attended in months. On January 25, 2019, the juvenile court entered its order granting DCS leave to amend its CHINS petition. On January 22, 2019, the State charged Mother in Boone County with two counts of Level 2 felony dealing in methamphetamine, one count of Level 4 felony possession of methamphetamine, one count of Class A misdemeanor dealing in marijuana, one count of Class B misdemeanor possession of marijuana, and three counts of Class C misdemeanor possession of paraphernalia.

[6] On February 27 and April 30, 2019, the juvenile court held a factfinding hearing. Mother admitted that she has been incarcerated at least ten times throughout her life. Child disclosed that when she was younger she had lived in foster care with her sister, with her grandmother and aunt, and with Father, who inflicted "major [physical] abuse" on her. Tr. Vol. II p. 65. Child had also lived with Mother "on and off during that time[,]" but Mother was incarcerated during most of it. Tr. Vol. II p. 65.

[7] When asked whether she had ongoing untreated substance abuse issues, Mother said, "Yes and no." Tr. Vol. II p. 40. When asked whether she was using illegal substances prior to her incarceration, Mother indicated that she wanted to "plead the Fifth." Tr. Vol. II p. 41. The juvenile court indicated that it would draw a negative inference from Mother's assertion of her Fifth Amendment right not to answer.

[8] FCM Yolanda Smith testified regarding Child's adjustment to foster care. Child, at first, struggled in foster care—she stole alcohol and returned to the foster home intoxicated, she stole from Walmart several times, fought with younger kids, hoarded food, and struggled with communication. Child has "large gaps in her educational background and is currently testing at about a 7th grade level." Tr. Vol. II p. 75. Child was doing better but still struggled with making appropriate decisions, including refraining from stealing and fighting, maintaining her hygiene, and with bed-wetting. Child was dealing with the bed-wetting issue prior to her removal. Child has an appointment scheduled to see a urologist at Riley Children's Hospital, the foster mother has provided her Depends undergarments, and her independent-living worker made her a chart to make sure she bathes regularly, brushes her teeth, and dresses appropriately. Child was not taking care of her own personal hygiene on her own, and FCM Smith did not believe that she would but for DCS's involvement. While in foster care, Child is also participating in tutoring twice a week, therapy once a week, and supervised visitation once a week.

[9] FCM Smith testified that it was necessary for DCS to be involved with Child for her own "safety and well-being" to ensure that services are being provided to address Child's hygiene issues and educational needs, as well as to ensure that services are in place for Mother to treat her substance-abuse issues and housing needs. Tr. Vol. II p. 69. Court Appointed Special Advocate ("CASA") Courtney Hayes testified that DCS needed to remain involved with Child because she "has some real challenges" and that she has been "making improvements, but she does have a long way to go and I think she needs the support services that we have in place around her." Tr. Vol. II p. 74.

[10] Following the hearing, the juvenile court found Child to be a CHINS. On May 22, 2019, the juvenile court held a dispositional hearing, and on May 28, 2019, entered its dispositional decree and parental participation orders ordering Mother to participate in services. The juvenile court ordered Mother to submit to random drug screens, attend all scheduled visitations, and participate in home-based casework and home-based counseling. The juvenile court also ordered Mother to complete a parenting assessment, a substance-abuse assessment, a mental-health evaluation, a psychological evaluation, a domestic-violence assessment, a psychiatric evaluation, and a family functional assessment, and all recommended services as a result of the evaluation or assessment.

# Discussion and Decision

[11] Indiana Code section 31-34-1-1 provides that a child is a CHINS before the child becomes eighteen years of age if

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

[12] The purpose of a CHINS adjudication is to "protect children, not [to] punish parents." *In re D.J. v. Ind. Dep't of Child Servs.*, 68 N.E.3d 574, 580–81 (Ind. 2017) (citations omitted). DCS bears the burden of proving that a child is a CHINS by a preponderance of the evidence. Ind. Code § 31-34-12-3; *see also In re N.E.,* 919 N.E.2d 102, 105 (Ind. 2010). The Indiana Supreme Court has stated that

> [a] CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the [juvenile] court's decision and reasonable inferences drawn therefrom. *Id*. We reverse only upon a showing that the decision of the [juvenile] court was clearly erroneous. *Id*.

*In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012) (footnote omitted). A juvenile court need not wait until a tragedy occurs before adjudicating a Child a CHINS. *In re R.S.*, 987 N.E.2d 155, 158 (Ind. Ct. App. 2013). Mother contends that the juvenile court's conclusion that Child's physical or mental

condition is seriously impaired or endangered is clearly erroneous and DCS failed to establish that Child's needs were unlikely to be met without State coercion.

## I. Whether Several of the Juvenile Court's Findings Are Unsupported by the Evidence

[13] Mother challenges several of the juvenile court's findings as clearly erroneous. Mother is correct that the following findings are erroneous: she was charged with four misdemeanor drug offenses (when she was actually charged with five), she was charged with two Level 4 felonies (when she was actually charged with two Level 6 felonies), and the only food found in the home was an onion, some butter, and some canned goods (when hamburger was also found). These errors, even when taken as a whole, can only be considered inconsequential. We will not reverse a judgment for harmless error, which is error that does not prejudice the substantial rights of a party. Ind. Trial Rule 61. However one looks at it, Mother was facing several serious criminal charges and Child was living in horrible conditions; none of the juvenile's courts errors change that.

[14] As for Mother's other challenges, she challenges the finding that "[Child] told FCM King she had been living in the home a few months and the last time she went to school was when she lived with her father." Appellant's App. Vol. II p. 72. FCM King, however, testified to exactly that: "[Child] stated that she lived there for a few months" and "she stated the last time she was in school is when she lived with her dad in Illinois." Tr. Vol. II p. 48. The record supports the finding.

[15] Mother also challenges the finding that "[a] few days before 1-14-19 [Child's] brother died. Mother was not present in the home on 1-14-19 because she went to Illinois to talk to a lawyer about filing a wrongful death lawsuit." Appellant's App. Vol. II p. 73. Mother seems to suggest that the juvenile court is required to credit her version when someone else has not provided testimony to the contrary. As the Indiana Supreme Court explained in *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004), however, "factfinders are not required to believe a witness's testimony even when it is uncontradicted." Mother's argument is a request for us to reweigh the evidence, which we will not do. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014).

[16] Finally, finding 27 states that "[t]he Court does not find [Mother] credible. [Mother] reported that [Child] has been previously diagnosed with ADD, ODD, bipolar and major depressive disorder. Mother reported that [Child] started seeing a psychiatrist when she was five years old." Appellant's App. Vol. II p. 73. In challenging this finding, Mother argues that the juvenile court finds her to not be credible, but then finds some of her statements credible, including Child's diagnosis. In other words, Mother seems to be arguing that the juvenile court's findings are internally inconsistent and therefore improper. We think, however, that a more reasonable interpretation is that the finding as a whole indicates that the juvenile court did not find Mother's statements regarding Child's diagnosis and prior medical care to be credible. Mother is asking us to reweigh the evidence, which we will not do. *See In re K.D.*, 962 N.E.2d at 1253.

[17] In the end, the findings that Mother challenges are largely supported by the record, and none of the juvenile court's errors are substantial enough to require reversal. *See In re B.J.*, 879 N.E.2d 7, 20 (Ind. Ct. App. 2008) (holding that because there was sufficient evidence outside the erroneous finding to support the trial court's conclusion, "the erroneous finding was merely harmless surplusage that did not prejudice" the mother and is not grounds for reversal), *trans. denied*.

## II. Child's Physical or Mental Condition Is Seriously Impaired or Endangered

[18] Mother challenges the juvenile's conclusion that Child's physical or mental condition is seriously impaired or endangered. The record contains ample evidence that supports such a conclusion. Child was living in filth, was not receiving the educational care that she needed, was unable to attend to her own hygiene, and had one parent who refused to care for her and another who was incarcerated. When DCS removed Child, she was living in a home that had feces on the bathroom floor and in the bathtub, a ceiling that was falling in, holes all over the floors and walls, drug paraphernalia, inadequate heat, and very little food. Child told FCM King that she had been living with Mother in this home for a few months and that she had not been to school since she lived with Father in Illinois. After her removal, it was discovered that she had "large gaps in her educational background" and tested at only a seventh-grade level. Tr. Vol. II p. 75. Additionally, Child needed a chart to remind her to bathe regularly, brush her teeth, and dress appropriately. Child also indicated to

FCM King that she had mental-health issues but had not been taking her medication. Child was also hoarding food and struggling with bedwetting. It is reasonable to infer that Mother had failed to provide for Child's care, education, mental health, and supervision.

[19] Moreover, Child had no parent willing and/or able to care for her at the time of the final hearing. Father refused to be involved in the CHINS case or in Child's life in general. Mother, who remained incarcerated as of the final hearing, was facing numerous charges, most of which were drug-related and strongly implied that Mother was also dealing with significant substance-abuse issues. Several of these charges were alleged to have been committed by Mother after DCS had removed Child and filed a CHINS petition. *See In re J.L.*, 919 N.E.2d 561, 564 (Ind. Ct. App. 2009) (noting that "[e]ven the filing of the CHINS petition was insufficient to deter Mother's drug use as she continued using up to the date of her drug screens").

[20] Mother compares her circumstances to those at issue in *M.K. v. Indiana Department of Child Services*, 964 N.E.2d 240 (Ind. Ct. App. 2012). *M.K.*, however, is easily distinguished. In *M.K.*, DCS intervened because the mother and her children—who were only in Indiana temporarily and who had housing and employment in Baltimore—were staying in a shelter and then a hotel. *Id.* at 242. We concluded that the evidence did not support a conclusion that the children were CHINS because the mother and the children were not "in and out of hotels and shelters" as DCS implied, and the mother "packed ample supplies" for the children. *Id.* at 246–47. Here, Mother was not meeting

Child's needs, as she did not supply Child with, *inter alia*, appropriate housing, supervision, or mental-health care and did not ensure that Child's educational needs were being met. Mother was also incarcerated, unable to provide any care or supervision to Child, and had unresolved substance-abuse issues. Mother has failed to establish that the juvenile court's conclusion that Child's physical or mental condition was seriously impaired or endangered is clearly erroneous.

## III.  Child's Needs Are Unlikely to Be Met Without Court Coercion

Mother challenges the juvenile court's conclusion that Child's needs are unlikely to be met without court coercion. "[T]he government is permitted to forcibly intervene in a family's life only if the family cannot meet a child's needs without coercion[.]" *Matter of E.K.*, 83 N.E.3d 1256, 1261 (Ind. Ct. App. 2017), *trans. denied*. "[T]he question is whether the parent[] must be coerced into providing or accepting necessary treatment for their child." *Id.* at 1262.

Here, the evidence supports that Child needed care and treatment that Mother was unable or unwilling to provide or accept without the coercive intervention of the juvenile court. As for the care Child had not been receiving from Mother, Child needed tutoring services to address her educational deficiencies; needed services to learn how to provide for her own basic needs, including personal hygiene; and she needed medical treatment or therapy to address both her bedwetting issue and her mental health needs, none of which she had been receiving from Mother. Mother also needed to participate in services to address

her substance abuse-issues and housing needs so that she could provide Child with a suitable environment.

[23] There is ample evidence to support a conclusion that Mother was unable or unwilling to provide these services to Child without the coercive intervention of the juvenile court. First, Mother had not enrolled Child in school or sought specialized services for her educational deficiencies prior to DSC's involvement, nor had she sought medical care for Child's bedwetting or mental-health issues, Mother knew that Child was having bedwetting issues, acknowledging that Child had both a bed and a recliner to sleep on in case she wet the bed.

[24] Mother's refusal to acknowledge the existence of issues that clearly need to be addressed also supports a conclusion that she is unwilling to give Child the help she needs. Mother will still not admit that she has a substance-abuse problem, despite the several drug-related charges pending against her, testifying that it had been several years since she had had any issues with drug use. Mother also denied that any conditions in the home were unsafe for Child prior to DCS's involvement, despite the ample evidence of filth, inadequate heat, and inadequate food. Mother's failure to acknowledge that there is a problem supports a conclusion that without the coercive intervention of the juvenile court, she is unwilling to accept the services that she and Child need.

[25] Moreover, there is ample evidence that Mother is unable to currently provide for Child's needs without court intervention, even if she were willing. To get straight to the point, Mother was incarcerated at the time of the final hearing and may be incarcerated for a long time to come, as she is facing, *inter alia*, two

pending Level 2 felony charges. While incarcerated, Mother will be unable to provide for even Child's most basic needs, let alone the specialized services Child needs, even if she wanted to. Of course, this incarceration was only the latest, as Mother had been incarcerated at least ten times previously, so there is no guarantee that she will stay out of jail for long when she is released. Given the totality of the circumstances, Mother has failed to establish that the juvenile court's conclusion that Child needed care or treatment that Mother was unable or unwilling to provide without the coercive intervention of the juvenile court is clearly erroneous.

[26] We affirm the judgment of the juvenile court.

Robb, J., and Altice, J., concur.